**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**BENTON, ILLINOIS**

| | | |
|---|---|---|
| **JAMES HUNT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Cause no.** |
| | ) | |
| **MOORE BROTHERS, INC., WEST** | ) | |
| **RIVER DISTRIBUTION, INC., SIDCO** | ) | |
| **INVESTMENTS, MIDWEST** | ) | |
| **OPERATIONS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT**

The Plaintiff, James Hunt, by his undersigned attorney, hereby allege against Moore

Brothers, Inc. ("MOORE"), West River Distribution, Inc. ("WRD"), Sidco Investments

("Sidco") and Midwest Operations ("Midwest"), as follows:

**NATURE OF THE CASE**

1.  This is a lawsuit brought against Defendants Moore, West River, Sidco and Midwest by

    an independent truck owner operator ("Hunt") involving an unlawful business scheme

    arising out of at least two truck financing agreements, the terms of which are

    intentionally vague, which may be characterized alternatively as a lease purchase or a

    sale and lease-back. Under the scheme, individuals are encouraged with an alleged

    opportunity to become independent truck owner operators with a fraudulent truck

    financing agreement and operating agreement facially suggesting reasonable terms. The

    agreement is implemented by Defendants and other participants to exact uncompensated

    labor from the Hunt by means of Moore's control of moneys paid by shippers for freight

    hauling and other services to make accounting mechanisms reflected on settlement

1

statements that exact duplicate payments by the Hunt toward truck payment, require that maintenance at inflated prices be performed by a Moore-related company, that require truck damage intentionally caused by the Moore-related maintenance company be included toward Hunt's ever-increasing indebtedness, that recycle trucks for lease/sale that have been left from previous failed operator/financing agreements. The scheme is accomplished through initial false representations to the Hunt, coerced diversion from the terms of the signed agreement and forced dispatch. Continued performance on the part of the Hunt is the result of fear of threatened consequences related to the ever-increasing improperly imposed indebtedness, including defamation, blackballing and imprisonment. Causes of action include RICO, antitrust, peonage and false misrepresentation. To any extent, alternatively, Hunt is alleged to be an employee, a cause of action is alleged for violation of the Illinois Employee Classification Act.

## JURISDICTION AND VENUE

2.  This action arises under 49 U.S.C. §14102, 14704(a)(2), 49 C.F.R. 376 *et seq.,* 18 U.S.C. §1962, 18 U.S.C. §1581, Section 1 of the Sherman Act, 15 U.S.C. §1  and Sections 3 and 4 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26.

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because the claims asserted herein arise under the laws of the United States. Supplemental jurisdiction of state law claims is proper under 28 U.S.C. §1337.

4.  Venue under the special venue provisions of 18 U.S.C. §1965 and 15 U.S.C. §22. Venue is also proper under 49 U.S.C. §14704(d) because Plaintiff resides in this district. Alternatively, venue is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred in

this judicial district. Shippers which do substantial amount of business with Defendants are located in Gillespi, Granite City and Madison. Defendants' trucks travel through the Southern District of Illinois en route to other states.

5. Plaintiff James Hunt is an independent trucker owner operator who resides at R.R. 1 Box 160, Bungay, Hamilton County, Illinois.

6. Defendant Moore Brothers, Inc. is a Nebraska corporation, which may be served with process at 84622 U.S. Highway 81, PO Box 1381, Norfolk, Nebraska 68702. Moore Brothers, Inc. performs administrative functions, is the IRP registrant and US DOT number holder for truck driven under the Moore Brothers name. Moore Brothers is the named insured. Moore Brothers holds the International Fuel Tax Agreement permit for each truck. Jeff Moore is the president of Moore. Sid Moore is its secretary and treasurer. Lance B. Moore is the general manager.

7. Defendant West River Distribution, Inc., is a Nebraska corporation, which may be served with process at 84622 U.S. Highway 81, PO Box 1381, Norfolk, Nebraska 68702. West River Distribution, Inc. is the name in which the trucks are titled. It issues checks to drivers and performs financial functions. It owns the equipment, land and buildings which are used by Moore.

8. Defendant Midwest Operations, Inc., is a corporation of unknown origin. Alternatively, it is a sole proprietorship owned by Rob Moore, who may be served with process at 84622 U.S. Highway 81, P.O. Box 1381, Norfolk, Nebraska 68702. Alternatively, Midwest is a general partnership owned by Rob Moore, Sid Moore, Jeff Moore and/or Lance Moore. Midwest Operations performs maintenance on all trucks owned by, lease by and/or lease to Moore Brothers, Inc. and West River Distribution.

9. On information and belief, Defendant Sidco Investments is a corporation of unknown origin, which may be located in the Cayman Islands. The company may be served with process through its president, Sid Moore at 84622 U.S. Highway 81, P.O. Box 1381, Norfolk, Nebraska 68702. On information and belief, Sidco Investments receives and distributes moneys received through activities of Moore, West River and Midwest.

10. On or about March 10, 2010, James R. Hunt began working as a driver for Moore Brothers under the company's required six month period as an employee prior to participate as owner operator through a lease/purchase of a truck.

11. As part of Hunt's employment, Hunt leased his services to a truck owner and represented that he was a qualified driver for Moore Brothers. He was paid by Midwest Operations.

12. On or about September, 2010, Hunt entered several written agreements with Defendants which are alternatively characterized as a truck lease-purchase or a truck purchase and lease back. These took place in Norfolk Nebraska and involved financing of and labor performed driving the Sterling.

13. On or about December, 2012, Hunt entered additional agreements in Norfolk, Nebraska with regard to the Freightliner.

14. Hunt does not have in his possession the signed contract, but has a form. On information and belief the contract terms took the following form.

15. Under a "Truck-Tractor Lease Agreement" ("1006 Lease") West River Distribution participated as "Owner" and Hunt participated as "Lessee."

16. The truck-tractor was identified as a Sterling with is internally identified as "Unit 1006."

17. Under the terms of the 1006 Lease, weekly payments were to be made in the amount of $200. The contract mentions and it was understood by Hunt, that the residual value of the

truck at the end of the 1006 Lease would be financed by Defendants to allow Hunt to own the truck at the end of the lease term.

18. Line haul revenue associated with the truck is paid by shippers to Moore Brothers. Payments were debited each week from the line haul revenue of the truck by Moore Brothers.

19. Moore Brothers controlled the term of the lease by declining to debit payments in certain months and decreasing payments in certain months. This practice was a problem because it increased the length of time the Lessee was required to work under the terms of an unworkable contract and subjected the Lessee to the threat of being held in default after having worked to earn equity toward purchase of the truck at residual value. Additionally, under the terms of the Lease, the ever-increasing debt balance on the account settlement sheets was added to the agreed residual value, making the cost of successfully completing the terms of the Lease unlikely if not impossible. The hope of eventual ownership, the notion that lease payments worked toward equity in the truck and fear of repercussion upon default holds the Trucker in the agreements, although the Trucker does not receive a living wage.

20. Although under the terms of the contract, the Trucker is paid 28% of line haul revenue, the amount is controlled and limited by Moore by means of assignment of short routes and cheap freight. Moore also controls earnings by means of requiring unlawful practices, such as speed and weight violations. If the Trucker refuses to comply with the unlawful conditions of assignment, the result is retaliation in the form of more limited routes and earnings.

21. Maintenance under the 1006 Lease and under the 1090 Lease was represented to be the responsibility of the Lessee. Repairs over $250 were to be jointly decided by the Lessee and Owner. The Owner was authorized to make any necessary repairs.

22. In practice, maintenance was required to be made by Midwest Operations. Unnecessary Maintenance was performed on the truck and damage was intentionally caused to the truck for which repair was charged to the Trucker. The amount owed for repairs is counted as ever-increasing debt owed by Truckers. The maintenance shop is not licensed by the state and not certified by DOT. The repairs made by Midwest Operations are not warranted, so repeat breakdowns are charged to the Trucker as debt owed to the Company.

23. As to the condition of the truck, the Trucker is responsible to inspect it and accept it as being in good condition. This appears to be a waiver of warranty by the Lessee.

24. The title is held by the Owner and the Trucker is stated to have no right, title or interest in the truck. The Owner is stated to be entitled to all income tax benefits, including depreciation.

25. In practice, the tax benefits claimed by Owner went beyond those allowed by law. Owner sent to the each Trucker a 1099 each year in the amount of the full line haul revenue earned by the truck, without regard for the 28% taken by Moore Brothers under terms of the Owner-Operator Agreement and without access to accounting information held by Defendants which delineate expenses, including fuel and insurance, paid by Moore Brothers and charged to Truckers. Alternatively, the amount of income attributed to the Trucker on the 1099 was the entire amount earned by the truck minus the 28% taken off the top by Moore Brothers. As the settlement sheet provided weekly by Moore Brothers

is ambiguous in its reflection of income earned, it is difficult to add up weekly figures to arrive at the number entered on the 1099.

26. The Termination provision applies upon Trucker default, which is defined by a list of eight items. Upon termination, the Trucker loses all rights to the Truck and the Owner is entitled to sell or lease the Truck to someone else.

27. In conjunction with the Truck Lease Agreement, the parties entered an Independent Contractor Operating Agreement. That contract is between the Trucker and Moore Brothers.

28. Under the Operating Agreement, the Trucker leases the truck and his labor to the Company.

29. The contract represents, contrary to course of practice with regard to maintenance, that the Trucker is not required to purchase or rent any products, equipment, or services from the Company as a condition of executing the Agreement. Maintenance that was required to be performed by Midwest Operations, included maintenance services in addition to parts and products.

30. As there is no warranty on repairs; repeat breakdowns are charged against the Trucker's debt. Such repairs included damage to a fuel filter and an oil filter that caused repeat breakdowns. The costs were charged against the Trucker's debt account.

31. The Operating Agreement provides: "If you have secured any advance of any kind from us, owe us any money, or request us to withhold money, we shall make deductions from any monies otherwise due you."

32. The Operating Agreement further provides that the relationship between the Trucker and the Company is subject to Government regulation and that the Trucker is responsible for

satisfying certain regulatory requirements. The agreement requires that the Trucker

conduct lawful operations and that the Trucker give the Company only that possession,

control and use of the Equipment the Company needs in order to meet governmental

regulations, as the Company agrees only to assume responsibility for operation of the

Equipment as contemplated by the government.

33. While it is absolved of responsibility for regulatory noncompliance, the Company has a

policy of forced dispatch that forces the Trucker to be in peril of violating speed, time

and weight regulations by requiring effort that cannot be accomplished within lawful

limits. The Trucker is coerced to keep driving out of fear of repercussion upon default

and in light of the ever-increasing debt over which the Trucker is little of no control.

34. On information and belief the Company maintains two sets of records—one accurate set

provided by the Trucker and a set that reflects compliance with time, speed and weight

requirements.

35. Contrary to company practice, the Operating Agreement represents that the Trucker is

free to store, maintain and repair the Equipment at a place solely of his choice. Actually,

the truck is stored at the Company location receiving maintenance when the truck is in

Nebraska. The Trucker is not allowed to have the truck repaired or maintained elsewhere

unless it cannot be driven back to Nebraska.

36. The Company agrees to secure licenses and permits in the Company's name and serves as

the "Motor Carrier." This provision is a problem after the Lease term is completed and

the Trucker seeks to perform the purchase term. The licensing and registration costs

involved in the Trucker assuming actual ownership prevent the transaction. Those costs

are not included in the amount financed and are disclosed after performance is completed.

Alternatively, the costs are included in the amount financed but are withheld from the Trucker upon completion of the contract terms. The Sterling is still in possession of Defendants, although all payments have been made, including improperly imposes maintenance debt, because Moore holds the license and registration.

37. The Operating Agreement specifies that the relationship is of Carrier/Independent Contractor and not as an Employer/Employee. In practice, however, the Trucker has little independence in light of forced dispatch, control of over prices charged to shippers, control over what the Trucker hauls, requirement that maintenance be performed by Midwest Operations and control over the Line Haul earnings and disbursement of payments.

38. An addendum provides several options as to pay scale available under the terms of the Operating Agreement.

39. Under the pay scale under which Hunt operated, the Trucker earns 72% of gross revenue received by Moore Brothers. This rate applies to units pulling a company trailer.

40. The other 28% percent goes to Moore Brothers.

41. It was Hunt's understanding at the time the contract was entered, that 28% was to be paid to him. The other 34% was for payment of expenses. These terms are reflected in the settlement statements provided by Moore Brothers. As the numbers are applied, however, the Trucker is locked into a system of ever-increasing debt and very little pay. The Trucker continues to drive in hopes of earning enough line haul revenue to eventually pay off the debt and own his truck. There is also fear of repercussions by the Company in the event of default.

42. On or about 2012, Hunt completed the lease term on the Sterling and entered a financing agreement with Moore Brothers to fund the purchase of the Sterling at the residual value. The agreement was nearly paid in December, 2013, when the Sterling broke down. While in the shop for repairs, Midwest Operations disabled the Sterling by tearing up the dashboard. Moore Brothers otherwise withheld possession of the Sterling for one year, claiming unpaid debt.

43. In an effort to cure any default position and to try to move forward toward fulfillment of the obligation, Hunt entered a new Truck-Tractor Lease Agreement with West River Distribution for a Freightliner, known as Unit 1090. The term of that lease was 80 weeks beginning on December 2, 2013 and ending on June 26, 2015. Weekly rental payments were $300. Otherwise the terms of the contract for lease of Unit 1090 were the same as those for Unit 1006.

44. On information and belief the Freightliner was owned by three previous failed Owner-Operators.

45. Use of Midwest Operations for maintenance is coerced by several means. If a Trucker does not sign a maintenance agreement there is a threat that retaliation will take the form of limitation of runs are assigned to him, assignment of short mileage and low paying runs or termination.

46. The settlement statements show how 72% of the line haul charge is distributed. Thirty four percent of the line haul charge is intended to be used to pay for operating the truck and includes fuel, maintenance, insurance, IFTA and road tax. On information and belief, base plates are also paid with the 34% earned "by the truck." The base plates are

maintained in the name of the company and lack of base plates has hindered Hunt from acquiring rightful possession of the Sterling, Unit 1006.

47. Cash advances are subtracted from the 28% owed to the Trucker, but those amounts are also added to the debt owed by the Trucker.

48. The settlement statements include two basic parts: The first page is identified as a "weekly settlement." It identifies the truck by Unit number and lists information for trips for the week. In the center of the page is detail of "Line Haul Rev." Net Pay is calculated by the rate agreed to in the addendum to the Operating Agreement as 72% in Hunt's case plus any percentage bonus. There are usually no tarp fees for some reason (which may be charged to the shipper for the Trucker's services under another account); fuel surcharge and mileage pay are added to the Line Haul Revenue.

49. The total of these amounts goes to the lower left corner of the settlement statement, where deductions are taken for the Truck Lease Payment and any vehicle purchase payments, such as a for a camper or a pickup. (Moore does not have a dealership license.) The resulting difference is shown on the second part of the settlement statement identified as "Account Quick Report" under the "amount" column. That column tracks expenses for the week which are charged to the truck, including fuel, maintenance, cash advances and insurance.

50. A running balance in the adjacent column keeps track of the amount owed by the Trucker to the company. Each week, after the truck payment is deducted, the amount the truck earned is credited to the balance. Amounts paid for maintenance, insurance and fuel are debited and the amount the truck earned is subtracted from the debt.

51. The upshot of the documentation indicates that, while the Trucker generally takes home 28% of the Line Haul Revenue and the Company receives its 28%, the 34% earned by the truck never fully pays the expenses. The shortfall is added to the debt owed by the Trucker each week, with no explanation. The analysis provided is incomprehensible to Hunt and other Truckers from the settlement data provided.

52. The truck leases signed in 2010 and in 2012 in Norfolk Nebraska misrepresented the independence of the Trucker in terms of truck maintenance.

53. In fact, Hunt was coerced to have truck maintenance performed by Midwest Operations. The Company determined what maintenance was required and how much was charged. The Company also caused damage to the trucks that caused increased need for maintenance and also caused down time.

54. For instance, Midwest Operations did $5000 damage to the dash of the Sterling, taking it out of operation. They were trying to repair the heater switch or light switch and used an electric drill on the plastic surface. The dashboard had to be replaced in order to make the truck operational. The repair charge was added to his debt.

55. As to the Freightliner, the engine had required rebuilding prior to the agreement signed by Hunt. The shop only replaced three cylinders. After Hunt entered the agreement, he had to pay to have the engine completely rebuilt. This would have been a warranted item in a licensed shop. The repair charge was added to his debt.

56. The Company encourages the Truckers to enter an unsustainable business plan and makes money in the otherwise anathema market of "hauling cheap freight" by causing Truckers to enter Truck Lease/purchase agreements with the lease-back of their truck and labor to the Company in a way that exacts payment of the expenses and profit from the proceeds

earned by the truck, while making only minimal payments of cash to the Trucker and by entering and publishing to the Trucker ever-increasing debt based on the expenses incurred. The contracts lock the Trucker into a cycle of poverty from which he cannot escape for fear of financial ruin, imprisonment, loss of apparent (and possibly imaginary equity), defamation and retaliation.

57. The Trucker continues to work with very few breaks in hopes of paying down the debt, owning the truck and choosing more profitable loads.

58. The truck leases signed in 2010 and 2012 in Norfolk, Nebraska misrepresented provision of the base plates, in that it failed to specify that the Trucker would pay for the plates, but that they would not be transferred to the Trucker after completion of the lease obligation.

59. The truck lease signed in 2010 and 2012 in Norfolk, Nebraska misrepresented the independence of the Trucker to use his own equipment. In fact, the Trucker is required to use the Company's trailer and pays 2% of the line haul for it, which is subtracted from earnings, which increases the debt.

60. The Company exploits its substantial bargaining power and false promises to require the Truckers to sign significantly one-sided contracts.

61. By tying the truck lease/purchase to maintenance products, parts and services, the Company is allowed to profit through volume of business and captive prices.

62. This is accomplished through deliberate coercion through threat of retaliation in the form of being denied job assignments, defamation, disablement of the truck and other hindrances to completion of the financing program, through which asset ownership and independent employment were falsely promised.

63. The Trucker is continually led to believe that successful fulfilment of the financial obligation is possible through weekly settlement statements that intentionally confuse the information presented.

64. Defendants receive substantial revenues from its systematic underpayment for labor and overcharging for maintenance.

65. The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.  During the time period covered by this Complaint, Defendants used the instrumentalities of interstate commerce to carry out their unlawful activities.

66. The relevant market is the United States market for trucking companies with fewer than 100 trucks which haul cheap freight.

67. Antitrust injury resulted from the Company's actions in that the Truckers were hindered in their efforts to obtain the falsely promised independent business opportunity. In addition, prices paid by shippers in the cheap freight hauling market were undercut, yet profitability on the part of the Company was maintained through gross underpayment for labor and excessive charges being subtracted from the Truckers' gross earnings and added to debt.

68. As a result of the activities alleged in this Complaint, Plaintiff was required to retain the assistance of a lawyer and incurred attorneys' fees and costs.

**COUNT 1**
**Peonage and**
**Conspiracy to Commit Peonage**
**18 U.S.C. §1581**

69. Plaintiff incorporates paragraphs 1 through 68 as if fully set forth in this Count I.

70. Defendants intentionally held Hunt against his will and coerced him to work in order to satisfy a debt.

71. This was accomplished through threat of legal coercion.

72. Defendants knowingly entered an agreement and/or reached an understanding to commit peonage as evidenced by the transactions documented.

73. At least one Defendant committed an overt act in furtherance of the agreement.

74. The agreement was explicit.

Wherefore, Plaintiff respectfully requests that this Court award judgment in favor of Plaintiff and against Defendants, jointly and severally, as follows:

    a)   Award restitution in an amount to be determined at trial.

    b)   Award punitive damages in an amount to be determined at trial.

    c)   Award attorneys' fees and costs in an amount to be determined at trial.

    d)   Award additional relief at law or in equity to which Plaintiff justly may be entitled.

## COUNT II
### RICO
### 18 U.S.C. §1962

75. Plaintiff incorporates paragraphs 1 through 67 as if fully set forth as part of this Count II.

76. Defendants' acts constitute racketeering activity in that they related to extortionate credit transactions. The means used for the forced dispatch is by cellular phone. The trucks were sold by Defendants without a dealer license. Other predicate acts arose under 49 U.S.C. §14102, 14704(a)(2), 49 C.F.R. 376 *et seq.*

77. A pattern is alleged by virtue of the two truck lease purchase transactions, by virtue of multiple extensions of credit over which Hunt had little or no control and by virtue of at

least five instances in which the term of the Lease of the Freightliner was unilaterally extended by Defendants by failing to assess payments and by taking payments in amounts less than the contract amount.

78. Defendants, participating as a principle, collected an unlawful debt within the meaning of the Section in that, while there was no stated interest rate, the Defendants increased the debt owed by amounts over which Hunt had little or no control and for which labor in an unspecified amount was required in order to accomplish repayment.

79. Defendants gained proceeds from the scheme in the amount of 28% of Line Haul Revenue, in addition to amounts required for truck maintenance as described herein as well as other amounts which were applied to the ever-increasing debt.

80. Defendants Moore Brothers, Inc. West River Distribution, Inc., Midwest Operations, Inc. and Sidco Investments have violated 18 U.S.C. §1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

81. The defendants form an "association in fact" enterprises within the meaning of 18 U.S.C. §1961(4).

82. Defendant Moore Brothers participated in the enterprise by conducting the operations of the trucking business and through its operating agreement with the Truckers, Moore Brothers is the IRP registrant and US DOT number holder for trucks driven under the Moore Brothers name. Moore Brothers is the named insured. Moore Brothers holds the International Fuel Tax Agreement permit for each truck.

83. Defendant West River Distribution participated in the enterprise by ownership of the land, facilities and vehicles. It also issues checks and performs financial functions.

84. Defendant Midwest Operations participated in the enterprise by performing maintenance on all trucks owned by, lease by and/or lease to Moore Brothers, Inc. and West River Distribution and otherwise participating in the tying of the maintenance to the lease purchase of the trucks, in excessive charges exacted for truck maintenance and in causing damage to certain trucks for purposes of retaliation, to increase enterprises revenue and to extend the time within which completion of the debt obligation would require.

85. The activities of the enterprise affect interstate commerce as the trucks are dispatched to shippers throughout the country.

Wherefore, Plaintiff respectfully requests that this Court award a judgment in favor of Plaintiff and against Defendants, jointly and severally, as follows:

    a) Award damages, trebled, in an amount to be determined at trial.

    b) Award attorneys' fees and costs in an amount to be determined at trial.

    c) Award additional relief at law or in equity to which Plaintiff justly may be entitled.

**COUNT III**
**Antitrust, Tying**
**15 U.S.C. §§1, 14**

86. Plaintiff incorporates paragraphs 1 through 68 as if fully set forth as part of this Count III.

87. The tying products are a Sterling truck and a Freightliner truck.

88. The tied products are maintenance services, parts and products, such as oil, filters etc.

89. Hunt was coerced by Moore and West River to purchase maintenance services, parts and products from Midwest.

90. Moore controls Midwest. Alternatively, West River controls Midwest.

17

91. Moore, West River and Midwest have sufficient market power in the tying product market to coerce Hunt's acceptance of the tied product.

92. The relevant market includes trucking companies in the United States with fewer than 100 trucks which haul cheap freight.

93. Defendants have market power in the relevant market because they are able to participate in hauling cheap freight and maintain a profit, using tactics which disadvantage truckers involved in Defendants' financing scheme.

94. The tying activity has resulted in anticompetitive effects in the tied market, as Hunt and the other 50-60 Truckers who drive under arrangements similar to that of Hunt's would otherwise have purchased maintenance services, products and parts from a licensed shop, which offers a warranty and which demonstrates to the purchaser the necessity and cost of any maintenance. This can be demonstrated by the maintenance logs of the Truckers.

95. The activities alleged in this Complaint involve interstate commerce in an amount that is not insubstantial because breakdowns have occurred in states other than Nebraska. In some cases, maintenance that would normally have been under warranty failed in states other than Nebraska and required repair. In any situation in which maintenance becomes necessary in a state other than Nebraska, the Trucker is required to drive the truck to Nebraska if the truck can be driven. Otherwise, maintenance sought in a state other than Nebraska takes place in coordination with Midwest and payment is made by Moore and charged to the Trucker's account.

Wherefore, Plaintiff respectfully requests that this Court grant judgment in favor of Plaintiff and against Defendants, jointly and severally, as follows:

        a)  Awards damages, trebled, in an amount to be determined at trial.

b) Award attorneys' fees and costs in an amount to be determined at trial.

c) Award any additional relief at law or in equity to which he justly may be entitled.

## COUNT IV
### False Misrepresentation

96. Plaintiff incorporates paragraphs 1 through 68 as if fully set forth as part of this Count II.

97. False misrepresentations were made in the written contracts as set forth in this Complaint.

98. The misrepresentations were known at the time that they were made to be false.

99. The misrepresentations were made with the intention that Plaintiff would rely on hem.

100.     Plaintiff reasonably relied on the misrepresentations and was damaged as a result.

Wherefore, Plaintiff respectfully requests that this Court grant judgment in favor of Plaintiff and against Defendants, jointly and severally, as follows:

a) Award damages in an amount to be determined at trial.

b) Award punitive damages in an amount to be determined at trial.

c) Award any additional relief at law or in equity to which he justly may be entitled.

## COUNT V
### Employee Classification Act
### 820CS 185/1-999

101.      Plaintiff incorporates paragraphs 1 through 68 as if fully set forth in this Count V.

102.     Alternatively, to any extent Hunt is deemed an employee, he alleges that he was misclassified as an independent contractor and was denied the benefits of compensated employment.

103.     Hunt was not free from the direction and control of Defendants over the performance of Hunt's services.

104.     Hunt does not have the right under the terms of his agreement with Defendants to perform similar services for others on whatever basis and whenever he chooses.

105.     Hunt performs services for the Defendants under the Moore Brothers name.

106.     While Hunt has a substantial investment in capital, title to the truck is held by West River.

107.     Moore Brothers holds the truck registration in its name.

Wherefore, Plaintiff respectfully requests that this Court grant judgment in favor of Plaintiff and against Defendants, jointly and severally, as follows:

a)   Award a penalty against Defendants in the amount of $500 per day per violation.

b)   Award attorneys' fees and costs in an amount to be determined at trial.

c)   Award any additional relief at law or in equity to which he justly may be entitled.

Dated: April 18, 2015.

Respectfully submitted,


/s/ Jana Yocom

By: _____

Jana Yocom Rine
ARDC #6193677
Suite 1
Mt. Vernon, Illinois 62864
Telephone:  618-731-1944
Facsimile:  618-242-4808
Email:  jana.yocom@gmail.com

*Attorney for James Hunt*